### THE P. H. BIRKHEAD.

(Circuit Court of Appeals, Seventh Circuit. October 2, 1900.)

#### No. 655.

COLLISION—MOORED VESSEL—EVIDENCE CONSIDERED.

> While a tug was moored in a proper position at the east and river front of a dock, a coal steamer and her consort unloaded in a slip at the north side of the dock, each in turn being tied up on the outside of the tug, from which direction a fresh wind was blowing, while the other unloaded. Immediately after they had gone, the tug began to list, and, later, sank, and it was found that her timbers had been freshly broken. No other vessels had been at the dock. *Held,* that the circumstantial evidence afforded by such facts, supplemented by the testimony of witnesses who claimed to have seen one or the other of such vessels strike against the tug while being maneuvered, was sufficient to sustain a finding that the injury was caused by the steamer or her tow, either by collision with the tug when approaching or leaving, or by pounding against her while tied up, notwithstanding the contrary testimony of their officers and crews.

Appeal from the District Court of the United States for the Eastern District of Wisconsin.

In Admiralty.

On September 25, 1897, Henry Rahr, the appellee here, and the owner of the steam tug Agnes C., exhibited his libel in the court below against the steamer P. H. Birkhead in a cause of collision. The appellants here, William F. Warren, Charles K. Pederson, and John Nelson, who were the owners of the P. H. Birkhead, intervened for their interest, and filed their claim and answer denying the collision. The court below pronounced for the libelant, and from the decree awarding damages the owners of the P. H. Birkhead appealed.

The Barkhausen and Hathaway dock, on the west bank of the Fox river at the port of Green Bay, is adjacent to and north of the Walnut Street Bridge, so called, spanning the river. At that point the river is about 800 feet wide, the channel being within 200 feet of the east bank. North of the dock is a slip for the accommodation of vessels loading or discharging at the dock. The water at the north of the slip was about 14 feet in depth. At the south end of the dock the water was quite shallow, and off that point, and in the shallow water, there were spiles,—either the remains of a dock, or driven there as a protection to the bridge. At the river front of this dock,

on the 30th day of October, 1896, the steam tug Agnes C. was lying moored to the dock, with no watch on board, and headed to the northward. This tug was 52 feet in length. On that day the steamer P. H. Birkhead, 156.8 feet in length, and laden with coals, and having in tow the barge Commodore, 176.5 feet in length, also laden with coals, arrived at the port of Green Bay. After passing the Main Street Bridge some considerable distance north of this dock, the steamer let go her consort, and proceeded to the dock in question, going alongside and outside the Agnes C., running her nose into the mud in the shallow water by the spiles, and being moored to the dock, her lines passing over the Agnes C. The consort was taken by a tug into the slip at the north of this dock, and there discharged her cargo. Upon completing discharge of her cargo, and in the afternoon of the day following, she exchanged places with the steamer Birkhead, and was moored to the river front of the dock outside the tug. The Birkhead entered the slip, and discharged her cargo, and on Monday morning, the 2d day of November, went astern into the stream, and thence proceeded alongside the Commodore, to which vessel she was made fast. At this time there was a fresh breeze blowing, either from the northeast or southeast, the evidence leaving the precise direction of the wind in some doubt; but there is not dispute that the wind was from an easterly direction. The steamer undertook to turn, with her consort, to the north. It is not clear from the evidence whether the two vessels went astern, and sought to turn stern foremost, or, going astern a short distance, sought to swing their bows out into the river, and so turn to the north. Whatever the maneuver, the steamer was unable to swing her bow around, and was finally obliged to seek the assistance of a tug to swing the bows of the vessel to the north. Before the arrival of the steamer, the Agnes C. was lying at the dock in fairly good condition, and uninjured, although it subsequently appeared that her frames, or some of them, were partially decayed. On the day after the departure of the Birkhead she appeared to list, and a day or two thereafter sank, was afterwards raised, put upon a dry dock, and examined. All or most of her timbers abaft the pilot house were found to be broken, "some of them cracked square off, and the balance cracked so they were no use to any one." They were broken at about the knuckle of the boat, some broken square off and others splintered; and the breaks appeared to be recent. Three seams in the bilge were open, and the guard rails on both sides the tug were broken. Five witnesses on the part of the libelant, testifying more than a year after the occurrence, claimed to have seen the Birkhead or her consort run into the tug while at the dock; two of them stating the occurrence to have been on the day of the arrival of the steamer, and three of them stating the collision to have occurred on the day of the departure of the steamer and her consort; three of them stating that it was the steamer that was in collision with the tug, one of them that it was the consort while lashed to the steamer, and one was in doubt whether it was the steamer or her consort, while they were lashed together. Seven witnesses on the part of the respondents, and who were officers or seamen on the steamer or her consort, testified that no collision occurred. The evidence was without contradiction that after the departure of the steamer and her consort, and prior to the sinking of the tug, no vessel was moored or came to that dock, or in the vicinity.

Frederick G. Mitchell, for appellants.

George C. Markham, for appellee.

Before WOODS, JENKINS, and GROSSCUP, Circuit Judges.

JENKINS, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The case with which we have to deal presents a question of fact merely, and needs not extended discussion. Prior to the arrival of the steamer and her consort, the Agnes C. was moored at the river front of the wharf, uninjured. The day after the departure of the steamer and her consort the tug was seen to list, and a day or two thereafter went to the bottom. Her frames were found to be broken

or splintered, exhibiting fresh breaks, and three of her seams below the bilge were open. What caused this injury? A few days before the arrival of the Birkhead the tug had been moved from her berth in the slip, and moored to her position at the wharf, in anticipation of the arrival of the steamer and her consort. No other vessel is shown to have been at that dock for some time before the arrival of the steamer. At that time the tug was apparently seaworthy. It is proven that no other vessels were in that vicinity after the departure of the steamer and prior to the sinking of the tug. These facts alone present a strong case of circumstantial evidence against the steamer, fortified by the evidence of five disinterested witnesses, each of whom claims to have been an eyewitness to the pounding or striking of the tug by the steamer or her consort. It is true that these witnesses differ much in their relations of the occurrences testified to. Two of them state the collision to have been on the day of the arrival of the steamer, and three of them on the day of her departure. They testified a year or more after the event, and memory of the date of an event in which neither had an interest might well be faulty. We are far, however, from believing that the memory of either witness was treacherous, even as to time. It seems to us not improbable, considering the extent of the injury, that there was more than one collision and pounding and crushing of the tug between the steamer or her consort and the dock. The two vessels laden with coals were at different times during the three days they were at the dock moored just outside the tug, and in close proximity to her. The evidence as to the manner in which they were respectively moored does not disclose that anything was done which would prevent the larger and heavier vessels, in the easterly wind then prevailing, from being driven against and pounding the tug against the dock. It may well be that part of the injury was caused in this manner and part by contact of the steamer with the tug upon her arrival, and by like contact at the time of her departure. The tug was there of right, and was in a position in which she was at the mercy of the steamer and her consort. It was the duty of the steamer in her maneuvers in close quarters to see to it that the tug suffered no injury. Notwithstanding the denials of those employed upon the steamer or her consort, we are, after a careful review of the evidence, impressed with the conviction that the Agnes C. received her injuries at the hands of the steamer or her consort, or both, and by reason of the faulty management of the steamer.

Upon leaving port, the Birkhead met the steamer Christie and consort coming in, and it is urged that these vessels, being laden, as it is supposed, with coals, may have caused the injury to the Agnes C. There is, however, no evidence that these latter vessels went to or near the dock in question, and no evidence to which bank of the river they went. We cannot assume, in view of the positive statement of the owner of the dock that no vessel was there after the Birkhead, that the Christie and her consort discharged at the dock in question. It could not have been a difficult matter to have shown where these vessels discharged, and under these circumstances it was the duty of the steamer to have shown the fact, and that the injury was caused by them. We are of opinion that the decree should be affirmed.